# In the United States Court of Federal Claims

No. 08-470C

(Filed Under Seal: July 25, 2008)
(Reissued: July 31, 2008)

* * * * * * * * * * * * * * * * * * * * * * * * *

ALABAMA AIRCRAFT INDUSTRIES, INC. - BIRMINGHAM,

Plaintiff,

v.

UNITED STATES,

Defendant, and

THE BOEING COMPANY,

Intervening Defendant.

* * * * * * * * * * * * * * * * * * * * * * * * *

Post-award bid protest; motions to supplement the administrative record and for discovery

David R. Hazelton, Latham & Watkins LLP, Washington, D.C., for plaintiff. With him on the briefs were Roger S. Goldman, Kyle R. Jefcoat, Benjamin Wei, Andrew Stein, and Shiva Aminian, Latham & Watkins LLP, Washington D.C.

Douglas K. Mickle, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Gregory G. Katsas, Assistant Attorney General, Civil Division, Jeanne E. Davidson, Director, and Brian M. Simkin, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel were Major Christopher L. McMahon, Air Force Legal Operations Agency, Arlington, Virginia and Kenneth C. Kitzmiller, Tinker Air Force Base Legal Office, Oklahoma City, Oklahoma.

Paul F. Khoury, Wiley Rein LLP, Washington, D.C. for intervening defendant. With him on the briefs were Rand L. Allen, Scott M. McCaleb, Kara M. Sacilotto, Nicole P. Wishart, and Heidi L. Bourgeois, Wiley Rein LLP, Washington, D.C.

**OPINION AND ORDER**[1]

LETTOW, Judge.

In this post-award bid protest case, pending before the court are motions filed by plaintiff Alabama Aircraft Industries, Inc. - Birmingham ("Alabama Aircraft") (formerly known as Pemco Aeroplex, Inc. ("Pemco")) for discovery and to supplement the administrative record.[2] Several prior protests preceded this action. The Department of the Air Force ("Air Force") issued a solicitation for a contract to perform Programmed Depot Maintenance ("PDM"), Unscheduled Depot Level Maintenance ("UDLM"), and modification installations for the Air Force's KC-135 Stratotanker fleet. The KC-135 Stratotanker is used primarily for refueling Air Force long-range bombers, although it is also used by other Air Force, Navy, and Marine Corps aviation units for aerial refueling support. Compl., Ex. 5 (Department of Defense Inspector General Report ("DODIG Report")) at 1.[3] Following the Air Force's initial award of a contract to Boeing Aerospace Operations ("Boeing") on September 10, 2007, Alabama Aircraft filed a protest with the Government Accountability Office ("GAO"). That protest was sustained in part in a decision issued on December 27, 2007. *See Pemco Aeroplex, Inc.*, No. B-310372, 2007 WL 4707636 (G.A.O. Dec. 27, 2007). GAO issued a second decision on February 1, 2008, denying a request by the Air Force for reconsideration. *See Pemco Aeroplex, Inc. – Reconsideration*, No. B-310372.2, 2008 WL 360927 (G.A.O. Feb. 1, 2008). After conducting a reevaluation recommended by GAO, the Air Force made a "new award decision" on March 3, 2008, again selecting Boeing, which decision Alabama Aircraft again protested to GAO on March 11, 2008. GAO denied this protest on June 13, 2008. *See Pemco Aeroplex, Inc.*, No. B-310372.3, 2008 WL 2684841 (G.A.O. June 13, 2008). Alabama Aircraft filed a complaint in this court on June 27, 2008, seeking a declaratory judgment that the Air Force's award to Boeing is arbitrary, capricious, or contrary to law and an injunction requiring the Air Force to terminate the contract awarded to Boeing.

---

[1]Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(7) of the Rules of the Court of Federal Claims and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this decision and to provide proposed redactions of any confidential or proprietary information on or before July 30, 2008. A closed hearing on the proposals was held July 31, 2008. The resulting redactions are shown by brackets enclosing asterisks, as follows: "[***]."

[2]This opinion consistently refers to Alabama Aircraft for the sake of clarity, except when quoting materials that refer to Pemco.

[3]The Air Force purchased 732 KC-135 aircraft during production between 1954 and 1965. Compl., Ex. 5 (DODIG Report) at 1. As the aircraft aged, a program of repair and maintenance was instituted, including regularly scheduled PDM at an Air Force base and several large contracting depots. *Id.*

Promptly after Alabama Aircraft's complaint was filed, the court adopted an accelerated schedule for filing the administrative record and for briefing cross-motions for judgment on that record in accord with Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"). At the request of the parties, this schedule allowed a short period after submission of the administrative record for expedited motions regarding the record, and Alabama Aircraft has filed timely motions to supplement the administrative record and for discovery. Those motions have been fully briefed by the parties and are ready for disposition.

As a factual matter, the motions for supplementation and discovery largely turn on the tangled history of the Air Force's maintenance and modification programs for the KC-135 Stratotanker rather than on specific aspects of the procurement at issue. This opinion accordingly reflects that focus, putting aside a detailed discussion of the Air Force's evaluation of the offerors' proposals until consideration of the merits at a later stage of this bid protest. The court has endeavored to act rapidly to resolve the procedural issues associated with the administrative record and discovery, such that the parties might proceed to brief the substantive issues in accord with the accelerated schedule set for the case.

**BACKGROUND**[4]

Alabama Aircraft provides aircraft maintenance and modification services to the Armed Forces, other agencies of the U.S. Government, and additional foreign and domestic customers. Compl. ¶ 9. Alabama Aircraft has been performing PDM for the KC-135 Stratotanker fleet since 1969, and it has reportedly processed over 2,400 aircraft, more than any other provider of these services. *Id.* Alabama Aircraft provided KC-135 PDM services as a prime contractor under a contract with the Air Force awarded in August 1994 and performed through 2001. *Id.* During that time, Alabama Aircraft was the only commercial prime contractor providing KC-135 PDM services. *Id.*

In 1998, the Air Force issued a Request for Proposals ("RFP") that combined KC-135 PDM with work on the A-10 aircraft and other services. Compl. ¶ 11. Alabama Aircraft protested the bundling of the KC-135 PDM with other services because it could perform the KC-135 PDM work but could not perform the other services bundled with it in the RFP. *Id.* GAO sustained Alabama Aircraft's protest. *See Pemco Aeroplex, Inc.*, B-280397, 1998 WL 667596 (G.A.O. Sept. 25, 1998). The Air Force, however, permitted the bundled RFP to go forward and

---

[4]At this preliminary stage in this bid protest, the court has largely focused on the parties' allegations and contentions, to provide a baseline for the motions to supplement the record and for discovery. The recitation of facts and allegations which follows accordingly should not be construed as constituting the court's findings of facts drawn from the administrative record and from evidentiary submissions on equitable issues.

awarded the bundled contract to an Air Force depot in partnership with Boeing. *See* Compl., Ex. 5 (DODIG Report) at 3.[5]

After Boeing experienced difficulties performing the KC-135 PDM work in fiscal years 1999 and 2000, the Air Force encouraged Boeing and Alabama Aircraft to enter into a teaming arrangement for fiscal years 2002 through 2007, followed by a source selection for fiscal year 2008 and beyond. Compl. ¶¶ 12-13. On October 27, 2000, in response to the Air Force's request, Alabama Aircraft and Boeing entered into a Memorandum of Agreement ("MOA") by which Alabama Aircraft agreed to serve as subcontractor to Boeing for KC-135 PDM. Compl. ¶ 13 (citing Ex. 5 (DODIG Report) at 3). The contract provided for one base year and five option years. *Id*. On November 3, 2004, the Air Force elected not to exercise the final two option years, finding that Boeing did not meet minimum quality standards for the final two years of its 1998 PDM contract and announcing the termination of the Boeing contract at the end of the fiscal year. *Id*. ¶ 16. The Air Force then awarded a sole-source "bridge" contract (the "Bridge Contract") to Boeing, again with Alabama Aircraft as a subcontractor, effective October 1, 2005, pending the award of a new contract, labeled the fiscal year 2008 Recompete ("Recompete" or "FY2008 Recompete"). Alabama Aircraft alleges that it was not given an opportunity to compete as a prime contractor for the Bridge Contract, *id*. ¶ 17, but Alabama Aircraft continued work as a subcontractor on the Bridge Contract. *Id.* ¶ 18. Boeing provided the Air Force with positive reviews of Alabama Aircraft's performance during this period. *Id.*

On May 20, 2005, the Air Force released a draft RFP for the FY2008 Recompete. Compl. ¶ 19. The draft Recompete RFP contemplated a Best Estimated Quantity ("BEQ") of 44 aircraft participating in the KC-135 PDM program in fiscal years 2009 and 2010 (base periods), and 46 aircraft from fiscal years 2011 through 2015 (option periods). On June 3, 2005, Alabama Aircraft and Boeing entered into an MOA concerning the FY2008 Recompete. *See* Compl., Ex. 6 (Alabama Aircraft-Boeing MOA, June 3, 2005). The Air Force formally released the Recompete RFP on August 19, 2005, dividing the work to be performed under the contract into three basic categories: Basic PDM, Over and Above ("O&A") Work, and Intermittent Tasks. Compl. ¶ 21.[6]

---

[5]The primary reason given for the Air Force's bundling of the work was to enable the 1995 Base Realignment and Closure Commission's planned closure of the Sacramento Air Logistics Center, one of two sources of depot repair. Compl., Ex. 5 (DODIG Report) at 2-3.

Awarding of the 1998 bundled contract to Boeing was done through Principal Deputy Assistant Secretary of the Air Force for Acquisition and Management Darlene Druyun, who was later convicted of illegally negotiating employment with Boeing while managing acquisitions in which Boeing was involved or interested. Compl. ¶ 11; *see* Compl., Ex. 5 (DODIG Report).

[6]Under the Recompete RFP, Basic PDM is the routine work to be performed on every plane which undergoes a PDM, and it comprises the largest portion of the contract. Compl. ¶ 22. Basic PDM includes inspecting particular parts of the aircraft and making repairs to those parts if necessary, and the fees for that work are paid on a fixed-price basis. *Id.* O&A Work comprises

Alabama Aircraft did not bid on the FY2008 Recompete as a prime contractor, and alleges that it specifically relied on the provisions of the MOA when deciding to team with Boeing rather than to submit an independent proposal as a prime contractor. Compl. ¶¶ 20, 25. In October 2005, Boeing submitted a proposal as prime contractor with Alabama Aircraft acting as its principal subcontractor to have responsibility for approximately half of the KC-135 PDM work. *Id*.

On May 31, 2006, the Air Force released an amendment to the FY2008 Recompete reducing the annual BEQ from 44 to 24 aircraft. Subsequently, on June 6, 2006, Boeing terminated its agreement with Alabama Aircraft, citing the reduced BEQ as the reason. Compl. ¶ 26.

Alabama Aircraft then filed an agency-level protest with the Air Force, requesting that the Recompete competition be reopened to allow it to submit a proposal. Compl. ¶ 27. The Air Force responded by amending the RFP to allow Alabama Aircraft and other prospective offerors to submit new proposals. *Id.* Alabama Aircraft subsequently submitted a bid.

In May 2007, four months after final proposals were submitted, the Air Force replaced Ronald Poussard as the Source Selection Authority ("SSA") and substituted Charles Riechers. Compl. ¶ 28. Alabama Aircraft asserts that Mr. Poussard had oversight responsibility for the KC-135 PDM program for many years, was very familiar with Boeing's and Alabama Aircraft's performance of KC-135 PDM work, and served as the SSA for this specific procurement until a few weeks before the award decision. *Id.* Alabama Aircraft also proffers its belief that Mr. Poussard was "involved in and largely responsible for the Air Force's decision not to extend Boeing's 1998 PDM Contract." *Id.*

On September 10, 2007, the Air Force notified Alabama Aircraft that it was not being awarded the FY2008 Recompete contract and that the award was being made to Boeing. The next day, September 11, 2007, Alabama Aircraft requested a debriefing, which was conducted on September 14, 2007, at Tinker Air Force Base in Oklahoma City, Oklahoma. Compl. ¶ 36. At the debriefing, the Air Force informed Alabama Aircraft that the competition had been very tight, reporting identical scores between Alabama Aircraft and Boeing in the areas of Proposal Risk

---

any work that must be done in addition to, *i.e.*, over and above, what is necessary for the fixed price or basic portion of the PDM. *Id*. ¶ 23. O&A Work is compensated on a fixed hourly rate for labor and on a cost basis for materials. *Id*. To qualify as O&A Work, a task must be outside the scope of Basic PDM and require either over $20,000 in material costs or more than 200 hours of labor. *Id*. Otherwise, the work is performed as part of Basic PDM. *Id.* Intermittent Tasks comprise items that are not part of the Basic PDM function, but which occur with enough regularity and uniformity that they can be costed on a fixed-price basis. *Id*. ¶ 24.

and Past Performance, and in four of the five areas under Mission Capability. *Id.* ¶ 37.[7] Further, Alabama Aircraft's evaluated price of $1.18 billion was only about $15 million (less than 1.3%) higher than Boeing's evaluated price. *Id*. Alabama Aircraft contends that at the briefing it was also informed that (a) the Air Force had not performed a review of the cost data provided by the offerors to check for price/cost reasonableness or realism; (b) the Air Force did not conduct any review into possible procurement integrity violations by Boeing; and (c) the Air Force did not have a mitigation plan or waiver regarding the issues of organizational conflicts of interest related to Boeing and one of its subcontractors. *Id.*

Alabama Aircraft also represents that during the debriefing it asked the Air Force about the change in SSA personnel, voicing its concern that Mr. Poussard's last-minute removal "reflected an effort to remove an individual very familiar with Boeing's past failings from the decision making process." Compl. ¶ 29. The Contracting Officer reportedly responded that the decision was made "above my pay grade" and provided no further information on the issue. *Id*.[8]

Alabama Aircraft filed a bid protest at GAO on September 19, 2007, challenging the procurement On December 27, 2007, GAO sustained in part and denied in part Alabama Aircraft's September 19 protest. *See Pemco Aeroplex, Inc.*, 2007 WL 4707636. Specifically, the decision sustained Alabama Aircraft's protest on the grounds that the Air Force failed to evaluate the price realism of Boeing's [***] and that the Air Force failed to evaluate the corresponding proposal risk from [***]. GAO denied the challenges to the Air Force's evaluation of past performance and mission capability, as well as to alleged organizational conflicts of interest and the alleged violation of procurement-integrity provisions. *See id*.

On January 7, 2008, the Air Force filed a request for reconsideration with GAO. This request was denied on February 1, 2008. *See Pemco Aeroplex, Inc. – Reconsideration*, No. B-310372.2. In its Decision, the GAO found that:

> the RFP in fact called for offerors to submit detailed cost-related data, including [***]. The offerors did so, and, as discussed below, the record shows that the agency reviewed the [***] proposed. The flaw in the record here, however, is the lack of contemporaneous evaluation

---

[7]The only difference under the Mission Capability factor was that Boeing received a "Blue" score for Supply Chain Management, while Alabama Aircraft received a "Green" score, which was one step below "Blue." Compl. ¶ 37; *see* Compl., Ex. 1 (FY2008 RFP) at 80.

[8]On October 14, 2007, following the publication on October 1, 2007 of an article in the *Washington Post* which questioned the business dealings of Mr. Riechers, the new Source Selection Authority, he was found dead after apparently committing suicide. *See* Compl., Ex. 8 (Andrea Shalal-Esa, *Suicide Note Cites Worry About Air Force Scandal*, washingtonpost.com, October 22, 2007).

> of the effect of Boeing's [***] on proposal risk or price realism. In its final revised proposal, Boeing offered [***]. It was therefore unreasonable for the agency not to document its conclusion that the [***] would not create proposal risk above the rating of "low risk" given to Boeing's proposal for each of the five proposal risk subfactors, or create concerns as to the realism of Boeing's price.

Slip op. at 4 (citations omitted).

Thereafter, on March 3, 2008, the Air Force issued a notice to Alabama Aircraft that a "new award decision" had been made and that Boeing had again been selected for the award. *See* Compl., Ex. 9 (Air Force Mem. (Mar. 3, 2008)). In the notice, the Air Force reported that its actions subsequent to GAO's December 27, 2007 decision "have not resulted in any changes to the ratings previously assigned to the [o]fferors." *Id*. at 1. A debriefing was conducted at Alabama Aircraft's request on March 7, 2008 at Tinker Air Force Base, during which Alabama Aircraft alleges that the Air Force advised that it "obtained no additional information, documentation[,] or explanation from Boeing on price realism or any other issue." Compl. ¶ 49. The revised Source Selection Decision Document ("SSDD") for the new award decision was largely identical to the original SSDD, with changes in sections pertaining to cost-price issues and risk assessments of the proposals. *Id*. ¶ 50.

On March 11, 2008, Alabama Aircraft filed a second bid protest at GAO regarding the KC-135 PDM procurement. Then, at program review meetings held among Air Force and industry representatives during March 11-13, 2008, Alabama Aircraft relates that the Air Force disclosed two changes to the KC-135 PDM program. First, the Air Force informed participants that a pilot program would be implemented to try a different PDM schedule, which, if successful, would be put into place before the expiration of the new KC-135 PDM Contract. Compl. ¶ 52. Second, the Air Force predicted that its in-house PDM facility (or its "organic" PDM) at Tinker Air Force Base would not be able to meet its projected capacity. *Id.* ¶ 53. Because the Air Force generally must perform PDM on one-fifth of the KC-135 fleet each year, Alabama Aircraft submits that the participants at the briefing recognized that the limitations of the organic PDM facility would mean more aircraft going to the contractor performing PDM. *Id.*

Alabama Aircraft filed a supplemental protest of the Air Force's new award decision on March 21, 2008, based on the announcement of significant changes to the Air Force's requirements and on alleged organizational conflicts of interest resulting from Boeing's alleged knowledge of and involvement in developing the changes for the KC-135 PDM program before they had been publicly announced.

GAO issued a decision on June 13, 2008, denying Alabama Aircraft's March 11, 2008 protest. *See Pemco Aeroplex, Inc.*, 2008 WL 2684841. GAO observed that the Air force had, among other things, performed

> an analysis of the [***] proposed by Boeing to perform various portions of the required tasks with the [***] that have been most recently experienced in performing those same tasks internally at Tinker Air Force Base; an analysis of Boeing's historical experience in achieving [***] on other aircraft programs; [and] consideration of the impact the aging fleet will have on workload requirements within the context of this solicitation.

*Id.*, 2008 WL 2684841, at *5. GAO concluded that the Air Force's results fell within the allowable zone of the agency's discretion. *Id.*, 2008 WL 2684841, at *6.

On June 27, 2008, Alabama Aircraft filed a complaint in this court protesting the actions of the Air Force in connection with the award to Boeing of the fiscal year 2008 RFP contract to provide KC-135 PDM. On July 3, 2008, the court granted a motion filed by Boeing to intervene in the case. The administrative record, consisting of approximately 45,000 pages, was filed on July 14, 2008.[9]

## ANALYSIS

When the court reaches the merits in this case, its review will be limited to the administrative record already in existence, "not some new record made initially by the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *see also Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985). However, because the administrative record in many bid protest cases "is something of a fiction," which cannot be "viewed as rigidly as if the agency had made an adjudicative decision on a formal record that is then certified for court review," the need for other evidence, and perhaps limited discovery, must be determined on a case-by-case basis. *Savantage Fin. Servs. v. United States*, 81 Fed. Cl. 300, 310 (2008); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338-39 (Fed. Cir. 2001) ("[T]his is one of those 'rare circumstances' where the reasons for the contracting officer's decision [which in that case were not disclosed in the administrative record] should be obtained by the contracting officer's [deposition] testimony, as was done in [*Citizens to Preserve*] *Overton Park[, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated in part by Califano v. Saunders*, 430 U.S. 99, 105 (1977) (abrogating *Overton Park* to the extent it recognized the Administrative Procedure Act as an independent grant of subject matter jurisdiction)]).

### A. Supplementation

Alabama Aircraft seeks to supplement the administrative record with materials in five different areas. *See* Pl.'s Mem. in Support of its Mot. to Supplement the Administrative Record ("Pl.'s Mot. to Supp.") at 4. Supplementation can be warranted in a bid protest to prepare for

---

[9]"AR __" refers to the administrative record filed with the court in accord with RCFC 52.1(a).

cross-motions for judgment upon the administrative record. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (observing that supplementation may enable the court to "give 'due regard' to 'the need for expeditious resolution of the action'" (quoting 28 U.S.C. § 1491(b)(3))). However, the matter of supplementation must be carefully weighed because judicial review of the agency's decision should focus on the contemporaneously generated administrative record already in existence. *Florida Power & Light*, 470 U.S. at 743.

1. *Omitted GAO materials.*

First, Alabama Aircraft seeks to add to the record materials that were part of the previous proceedings before the GAO but that were omitted by the government in filing the record here. RCFC Appendix C, ¶ 22(u) provides that an administrative record before this court should include, if applicable, "the record of any previous administrative or judicial proceedings relating to the procurement, including the record of any other protests of the procurement." The government and Boeing concede that the administrative record contained incomplete copies of a few items which were filed with GAO during the proceedings before that entity. Def.'s Opp'n to Pl.s' Mots. ("Def.'s Opp'n") at 16-17; Boeing's Resp. to Pl.'s Mot. to Supplement at 1-2; *see Murakami v. United States*, 46 Fed. Cl. 731, 735 n.4 (2000) ("[A]llowing the record to be supplemented by evidence that the agency considered but did not include in the record might be viewed as not supplementation at all, but merely requiring that the administrative record be complete."). The motion to supplement is granted to the extent additions are necessary to provide complete documents.[10]

2. *Materials obtained through discovery.*

Second, Alabama Aircraft seeks to supplement the record with materials it hopes to obtain as a result of its motion for discovery. Pl.'s Mot. to Supp. at 6. The motion to supplement the record with such materials is granted in part and denied in part, in accord with the court's rulings on Alabama Aircraft's motion for discovery addressed in Part B *infra*.

[10]The court grants plaintiff's motion to add page 45 of AR Tab 60, Proposal Analysis Report/Price Competition Memorandum Addendum 1, attached to plaintiff's Motion to Supplement as Exhibit C. Although the court notes that this document is replicated, in full, at AR Tab 93.1, pages 43 through 132, the motion is granted for the sake of the completeness of AR Tab 60. However, the court denies the motion insofar as it concerns the need to include the final signed versions of the Air Force's Memorandum of Law and the Contracting Officer's Statement of Facts filed with the GAO. The texts of these documents that were filed electronically with the GAO already appear in the record at AR Tab 93.1, pages 1608 through 1659.

3. *Materials bearing on irreparable injury.*

The third item sought to be added to the record by Alabama Aircraft is the company's Form 10-K, filed with the Securities and Exchange Commission ("SEC"), which plaintiff seeks to use in proving the irreparable harm it alleges resulted from the Air Force's award to Boeing. Pl.'s Mot. to Supp. at 6-7. Specifically, the 10-K shows that the KC-135 PDM accounted for two-thirds of the company's revenue in 2007, and just under three-quarters of its 2006 revenue. *Id*. at 7. As to the 10-K, the motion is granted in part and denied in part. The motion is granted insofar as the court accepts the document as part of the record developed before the court relating to an issue wholly within its purview (irreparable injury), but not as part of the administrative record developed before the Air Force. *See PGBA, LLC v. United States*, 60 Fed. Cl. 567, 568 n.1 (2004) ("It is the responsibility of this Court, not the administrative agency, to provide for factual proceedings directed toward, and to find facts relevant to, irreparability of harms or prejudice to any party or to the public interest through grant or denial of injunctive relief."), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004); *see also* RCFC 52.1, Rules Committee Note, 2006 Adoption ("Cases filed in this court frequently turn only in part on action taken by an administrative agency. In such cases, the administrative record may provide a factual and procedural predicate for a portion of the court's decision, while other elements might be derived from a trial, an evidentiary hearing, or summary judgment or other judicial proceedings."); *Knowledge Connections, Inc. v. United States*, 79 Fed. Cl. 750, 760-61 (2007); *Geo-Seis Helecopters, Inc. v. United States*, 77 Fed. Cl. 633, 635 n.4 (2007).[11] The motion is denied to the extent that Alabama Aircraft requests that the administrative record be supplemented with the 10-K, since this item was not before the Air Force when it granted the contract to Boeing. *See Knowledge Connections*, 79 Fed. Cl. at 761; *Geo-Seis*, 77 Fed. Cl. at 635 n.4.

4. *Information arising after award decision.*

Fourth, Alabama Aircraft seeks to supplement the record with an article appearing in the *New York Times* on July 10, 2008, regarding the reopening of a procurement for a replacement plane for the KC-135. Plaintiff argues that supplementation with this newspaper article is appropriate because it constitutes "evidence arising after the agency action [that] shows whether the decision was correct or not." Pl.'s Mot. to Supp. at 7 (citing *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989)). The article discusses the status of the Air Force's attempts to replace the KC-135 with the KC-X, and Alabama Aircraft proffers this as "relevant to determining the Air Force's actual needs for KC-135 PDM." *Id.*

---

[11]The court could also choose to take judicial notice of filings made with the SEC. *See Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384, 391 (S.D.N.Y 2001) (A federal court may "take judicial notice of . . . reports filed pursuant to [SEC] regulations as facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'").

This aspect of the motion is denied. In addition to the fact that the article was not before the SSA at the time of the award, *see Knowledge Connections*, 79 Fed. Cl. at 761, there is no basis under Fed. R. Evid. 201(b) for the court to take judicial notice of the article. Rule 201(b) provides that the court may take judicial notice of any fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." For a fact to be judicially noticed under Rule 201(b), "indisputability is a prerequisite." *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995). A report in the *New York Times* is not necessarily "indisputable," nor would it state facts "whose accuracy cannot be questioned."

The court will, however, take judicial notice of GAO's decision rendered June 18, 2008, granting Boeing's protest of the Air Force's award to Northrop Grumman Systems Corporation of the contract for the KC-X procurement program. *See The Boeing Company*, Nos. B-311344; B-311344.3; B-311344.4; B-311344.6; B-311344.7; B-311344.8; B-311344.10; B-311344.11, 2008 WL 2514171 (G.A.O. June 18, 2008). The court also notes that it could take judicial notice of any press releases by the Air Force or transcripts of press conferences by Air Force officials regarding that GAO decision, upon a proper proffer by a party.

5. *Information relating to Boeing's past performance.*

The final items at issue in Alabama Aircraft's motion to supplement are civil and criminal settlement agreements entered between Boeing and the government regarding Boeing's past performance of contracts related to the procurement at issue. Pl.'s Mot. to Supp. at 8. In these documents, Boeing agreed, among other things, to pay a total of $615 million to settle, in part, its wrongful conduct relating to Air Force contracts. *See* Pl.'s Mot. to Supp., Ex. F (Civil Settlement Agreement) and G (Criminal Settlement Agreement). The agreements concern the "Druyun Matter," which, among other things, is related to the award of the 1998 bundled KC-135 PDM contract to Boeing. Specifically, this matter is defined by Boeing's civil settlement agreement as "(a) Boeing's hiring and employment of Darleen A. Druyun's ([']Druyun's[']) daughter and future son-in-law; (b) Boeing's recruitment of Druyun and act of hiring Druyun, including Boeing's dealings, communications, negotiations, and relationships with Druyun, whether direct or indirect, in connection with the foregoing; and (c) any alleged improper bias or improper official action by Druyun resulting from (a) or (b)." Pl.'s Mot. to Supp., Ex. F (Civil Settlement Agreement) at 2.

Plaintiff's motion to supplement the administrative record with the civil and criminal settlement agreements is granted because these agreements were available to the Air Force at the time it made its decision and underpinned a part of its consideration of Boeing's past performance. The inclusion of these agreements will merely ensure that the administrative record is complete.

**B. Discovery**

Alabama Aircraft seeks discovery in five areas. *See* Pl.'s Mem. in Support of Mot. for Discovery ("Pl.'s Discovery Mot.") at 1. Discovery may be appropriate in a case involving review of an administrative record where "additional materials . . . will assist the court in conducting a 'thorough, probing, in-depth review' review of the agency action." *Myers Investigative & Sec. Servs. v. United States*, 47 Fed. Cl. 288, 293-94 (2000) (quoting *Overton Park*, 401 U.S. at 415); *cf. Asarco, Inc. v. United States Envt'l. Protection Agency*, 616 F.2d 1153, 1160 (9th Cir.1980) ("The court cannot adequately discharge its duty to engage in a 'substantial inquiry' if it is required to take the agency's word that it considered all relevant matters."). Additionally, this court may consider "extra-record" evidence and permit discovery in bid protest cases when "'there has been a strong showing of bad faith or improper behavior' (so that without discovery the administrative record cannot be trusted)." *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 458 (D.C. Cir. 1994) (quoting *Community for Creative Non-Violence v. Lujan*, 908 F.2d 992, 997 (D.C. Cir. 1990)); *see also Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338 (2004).

1. *Alleged organizational conflicts of interest.*

Alabama Aircraft alleges that Boeing had organizational conflicts of interest that the Air Force failed to address with a mitigation plan or waiver, such that Boeing should have been disqualified as a bidder. Alabama Aircraft avers that "Boeing's contacts with the Air Force allowed [it] improper influence and improper access to non-public Air Force information," resulting in "an unfair, competitive advantage." Compl. at 20 (heading before ¶ 61) (capitals omitted). In its motion for discovery, Alabama Aircraft asserts that the government "has failed to produce materials related to the consulting agreements that Boeing and [its subcontractor,] L3 [Communications ("L3")], had (and have) with the Air Force related to the KC-135 PDM program, the information to which they had access, the work that they performed, the deliverables that they provided to the Air Force, or communications that they had with the Air Force on the KC-135 PDM program." Pl.'s Discovery Mot. at 2.

To prevail on its organizational conflict claim in subsequent proceedings, Alabama Aircraft will have to establish a violation of statutory or regulatory provisions relating to conflicts of interest. *See Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1335 (Fed. Cir. 2004) (citing 18 U.S.C. § 208; 5 C.F.R. § 2635.403(c); 48 C.F.R. [Federal Acquisition Regulation ("FAR")] §§ 1-18). Circumstances that create potential conflicts of interest are identified and addressed in FAR Subpart 9.5, which instructs agencies to identify potential OCIs "as early in the acquisition process as possible" and to "[a]void, neutralize, or mitigate significant potential conflicts" before a contract is awarded so as to prevent an unfair competitive advantage. FAR § 9.504(a).

FAR Subpart 9.5 describes three basic situations in which organizational conflicts of interest arise. *See generally* Daniel I. Gordon, *Organizational Conflicts of Interest: A Growing*

*Integrity Challenge*, 35 Pub. Cont. L.J. 25, 32 (2005) ("[B]ased largely on the language in FAR subpart 9.5, the case law has divided OCIs into three groups – referred to as 'biased ground rules,' 'unequal access to information,' and 'impaired objectivity.'"). GAO's decision in *Aetna Government Health Plans*, B-254397, 1995 WL 449806 (G.A.O. July 27, 1995), describes organizational conflicts grouped under the heading "unequal access to information" as follows:

> Th[is] . . . group consists of situations in which a firm has access to nonpublic information as part of its performance of a government contract and where that information may provide the firm a competitive advantage in a later competition for a government contract. FAR § 9.505-4. In these "unequal access to information" cases, the concern is limited to the risk of the firm gaining a competitive advantage; there is no issue of bias.

*Aetna Gov't Health Plans*, 1995 WL 449806, at *8. Incumbent status, without more, does not constitute "unequal access to information" for purposes of showing this type of organizational conflict. *Systems Plus, Inc. v. United States*, 69 Fed. Cl. 757, 771 (2006) (internal citations omitted). The other category of organizational conflicts potentially triggered by Alabama Aircraft's allegations is that of "biased ground rules," as discussed in the *Aetna Health Plans*:

> Th[is] group consists of situations in which a firm, as part of its performance of a government contract, has in some sense set the ground rules for another government contract by, for example, writing the statement of work or the specifications. In these "biased ground rules" cases, the primary concern is that the firm could skew the competition, whether intentionally or not, in favor of itself. FAR §§ 9.505-1, 9.505-2. These situations may also involve a concern that the firm, by virtue of its special knowledge of the agency's future requirements, would have an unfair advantage in the competition for those requirements.

*Aetna Gov't Health Plans*, 1995 WL 449806, at *8.

Alabama Aircraft emphasizes that the FY2008 Recompete identified "Boeing Aerospace Operations, Inc." as one of three consultants to provide "non-[g]overnment advisor support," and that the contracting officer likewise identified "Boeing Aerospace Operations" as a consultant. Compl. ¶¶ 61-62 (citing AR Tab 2 (Pemco Aeroplex, Inc. – Contracting Officer's Statement of Facts, B-310372.1 (Oct. 19, 2007) at 24-25). Alabama Aircraft raises the problem that Boeing Aerospace Operations was identified as both a contract consultant for the award and as the eventual awardee. *See id.* ¶ 63. However, during GAO's proceeding involving the initial bid protest, the Air Force averred that it did not use Boeing as a consultant for the KC-135 PDM contract despite its pre-award designation of Boeing Aerospace Operations as such. *Id.* ¶ 64. Alabama Aircraft nonetheless contends that Boeing provided technical assistance under a separate Sustaining Engineering Services Contract, as the original equipment manufacturer. *Id.* ¶ 65. Through that Sustaining Engineering Services Contract, Alabama Aircraft avers that

Boeing had unequal access to nonpublic information related to the actual quantities of PDM work that might be performed by a contractor over the term of the new contract. *Id*. ¶ 66.

Specifically, Alabama Aircraft maintains that by awarding Boeing contracts to provide unspecified "[a]rchitect and engineering services" for the KC-135, the Air Force employed Boeing to assist in the development of the PDM process. Pl.'s Discovery Mot. at 2. It avers that Boeing had knowledge of the development of a new PDM maintenance cycle that the Air Force did not publicly announce until March 11-13, 2008, long after the closing date for receipt of proposals and eight days after the reevaluated award had been made to Boeing. *Id*. at 2-3. The announcement concerned a pilot program that would change the PDM schedule for the KC-135 aircraft from the current five-year maintenance schedule to a new four- and eight-year schedule, comprised of "light" maintenance every four years and "heavy" maintenance every eight years. Pl.'s Discovery Mot. at 2.

Under the pilot program, in 2009 and 2010, a total of thirteen KC-135 aircraft will be subject to "light" PDM maintenance. Pl.'s Discovery Mot. at 2-3. Under the "light" PDM to occur four years after the last depot-level maintenance for these thirteen aircraft (and one year before they would be scheduled to return for depot-level PDM), these aircraft will not undergo certain major repairs, such as flight control servicing and repainting. *Id*. Four years after "light" PDM and eight years after the aircraft's last regular PDM, the same pilot group of aircraft will be subject to "heavy" PDM, consisting of major repairs omitted from the "light" PDM. *Id*. If the four- and eight-year maintenance schedule pilot program proves successful with the thirteen aircraft, the Air Force may adopt this program fleet-wide in lieu of the current five-year PDM schedule. *See id*. The Air Force projects that the pilot program PDM may eliminate many maintenance hours compared with PDM in the current five-year schedule. *Id*.

Additionally, Alabama Aircraft alleges that Boeing's subcontractor, L3, also had an organizational conflict that the Air Force should have investigated. Compl. ¶ 84. L3, it alleges, "participated in Boeing's proposal efforts while simultaneously advising the Air Force on the KC-135 program as a member of . . . the Air Force's LEAN consulting team" for the Oklahoma City Air Logistics Center at Tinker Air Force Base. *Id*. ¶¶ 84-85. L3 allegedly was involved in "designing, developing, constructing, installing, and delivering a lean transformation program" for the Air Logistics Center. *Id*. ¶ 85. The Oklahoma City Air Logistics Center is responsible for the KC-135 PDM program, including the procurement at issue, and advises on how to service KC-135s more efficiently. *Id*. ¶ 86. Alabama Aircraft avers that it learned that L3 "was on the Boeing team" upon receiving the Source Selection Decision Document provided at the debriefing on September 7, 2007. *Id*. ¶ 88 (citing AR Tab 5 (Source Selection Decision Document) at 5). It alleges that the Air Force failed to review any OCI issues or implement any program to mitigate this conflict. *Id*. ¶ 89.

The government responds that discovery is unwarranted because Alabama Aircraft's organizational conflict allegations were "ultimately rejected" by GAO "because there were no improper actions involving Boeing or L3 in the award of this contract." Def.'s Opp'n at 21. The

government acknowledges that "Boeing and L3 were Air Force consultants on PDMs," but it argues that the record evidence refutes any allegation that Boeing and L3 "improperly consulted on the PDMs for this procurement," or, indeed, that either consulted on the instant procurement at all. *Id*. It characterizes Alabama Aircraft's "allegation that Boeing and L3 had access to non-public information . . . regarding the quantity of aircraft undergoing PDM" as an unfounded assertion that the Air Force changed its actual requirements during the bid process. *Id*. at 21-22. The government avers that the Air Force has not yet made a decision regarding when and whether to implement the new four- and eight-year cycle PDM schedule, and that Alabama Aircraft has incorrectly assumed that such a decision would have an impact on the procurement at issue. *Id*. To support that assertion, the government cites a declaration provided to GAO on April 4, 2008 by Colonel James J. Nally of the Source Selection Advisory Council for the KC-135 PDM contract:

> While we continuously evaluate out-year requirements, the number of aircraft expected to undergo contract PDM has not changed. . . . The Air Force has not changed from the current five-year PDM cycle. . . . The four/eight-year maintenance concept is an on-going study. . . [and] [a]ll the data necessary to make this decision will not be available until FY14.

*Id*. at 22 (citing AR Tab 84 (Declaration of Colonel James J. Nally) at 7).[12] The government argues that the four- and eight-year cycle pilot program is merely "a prototype for which the results will not even be known for at least five more years," and which "would not necessarily dictate any changes from the contracted way of doing business." *Id*. Alabama Aircraft's motion for discovery on the matter is, in the government's view, "essentially seeking information upon something that does not exist." *Id*. at 23.

Additionally, the government argues that the record demonstrates that L3's work for the Air Force was on a contract separate from the procurement at issue, where L3's only role was "to improve Tinker's organic [maintenance] line, not to learn from the [g]overnment or to shape the [g]overnment's contract PDM effort." Def.'s Opp'n at 23 (citing AR Tab 93.1 at 1658). Furthermore, the government asserts, because "Boeing, Pemco, L3, and Tinker AFB have all visited each other's PDM lines in the past to freely share best practices," "L3's expertise was available to anyone . . . interested in performing PDM work." *Id*. (citing AR Tab 93.1 at 1658).

The government also contends that the Air Force's disclosure of potential organizational conflicts on the part of Boeing and L3 was adequate. "The [FY2008 Recompete RFP] contained a specific provision which advised all offerors that technical and cost/price data submitted to the Air Force in response to the solicitation may be released to non-[g]overnment advisors for review and analysis," identifying Boeing as one of those advisors. Def.'s Opp'n at 23 (citing AR Tab 4 (FY2008 Recompete RFP) at 51-52). It contends that disclosure of any organizational conflicts

---

[12]Colonel Nally's declaration may be accurate but it manifestly is a *post hoc* addendum to the contemporaneous administrative record.

respecting L3 was unnecessary because Pemco, Alabama Aircraft's predecessor, "was on the original Boeing/Pemco/L3 team when Boeing submitted its first proposal on October 21, 2005." *Id*. at 24 (citing AR Tab 93.1 at 1658). Indeed, Pemco certified in its initial proposal to the Air Force that it had no objection to Boeing's potential role. *Id*. (citing AR Tab 16 (Pemco's Proposal in Response to FY2008 Recompete RFP) at 1759). The government argues that because Pemco, Alabama Aircraft's predecessor, failed to raise any objection "until the Pemco protest was filed" and the challenge to a term of the proposal was thus not raised before the award, that challenge is now waived as untimely. *Id*. (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007)). Finally, the government submits that the record contains the contracting officer's statement that "'no employee of Boeing was ever consulted for technical, or any other information regarding the evaluation of any proposals,'" and "'L3 has never been a consultant for the SSET, nor have they been asked by the team, either directly or indirectly, for information, nor have they had any influence on the decision makers in this source selection.'" *Id*. at 24-25 (quoting AR Tab 93.1 at 1658).

The government contends that the present record shows that the Air Force also had a mitigation plan to guard against organizational conflicts: namely, in addition to being notified that Boeing might serve as an advisor to the government, offerors were further advised that Boeing would only be consulted on technical questions by the Source Selection Team and that those individuals at Boeing responsible for answering the questions would sign non-disclosure agreements. Def.'s Opp'n at 25 (citing AR Tab 4 (FY2008 Recompete RFP) at 52). Such non-disclosure agreements were never invoked because the Source Selection Evaluation Team never consulted Boeing. *Id*. Additionally, the contracting officer overseeing the separate transformation contract provided a non-disclosure agreement to all L3 employees, to be signed prior to working on the transformation program so as to avoid the potential for any organizational conflict of interest. *Id*. (citing AR Tab 93.1 at 1658). The government concludes that the notification provision and the non-disclosure agreements and provisions together constitute an adequate mitigation plan.

Alabama Aircraft replies that it focuses not on any consultation by the Air Force with Boeing and L3 on this procurement, but rather on the fact that the Air Force used Boeing and L3 as consultants on the KC-135 PDM program generally. Pl.'s Reply at 2. It argues that "[n]either the Air Force nor Boeing deny that Boeing had and has an architect and engineering services contract under which Boeing performed a variety of tasks related to KC-135 PDM – including developing the proposed radical change in the PDM schedule . . . [nor do they] deny that L3 had a subcontract under which it provided consulting services regarding the provision of KC-135 PDM services at [Tinker]. These contracts . . . are closely related to providing the same services." *Id*. Alabama Aircraft highlights that GAO's decisions did "not analyze *these* OCI arguments," – *i.e.*, organizational conflicts not limited to this particular procurement but rather based upon "Boeing's and L3's symbiotic relationship with the Air Force regarding KC-135 PDM generally." *Id*. at 2-3 (emphasis added).

The court finds credible Alabama Aircraft's argument that even a potential change in the PDM schedule and in the quantity of KC-135 aircraft subject to PDM might have been valuable information in structuring a bid. For instance, "a contractor who knew that the PDM schedule would likely be radically overhauled later in the contract could make [***]." Pl.'s Reply at 3. This possibility is tied to the [***] aspects of Boeing's prevailing bid and to the Air Force's cost-realism analysis conducted after GAO sustained the first protest. In that respect, however, the present administrative record should enable the court to determine whether Boeing put forward a [***]. Discovery on organizational conflicts is accordingly denied.

2. *Air Force's requirements.*

Second, Alabama Aircraft's motion for discovery requests that the court order the government to produce information regarding the Air Force's requirements for quantities of KC-135 aircraft undergoing contractor PDM. Pl.'s Discovery Mot. at 1. The Air Force evaluated the cost of contract proposals based on the pricing of maintenance for twenty-four aircraft per year, the best estimated quantity stated in the RFP, which Alabama Aircraft alleges is an understatement of projected requirements. Pl.'s Discovery Mot. at 8-10.[13] Alabama Aircraft alleges that it was prejudiced by the understatement because a [***] in the estimated number of KC-135 aircraft for which contractors would perform PDM [***] would result in its price being the lowest bid. *Id.*

In support of its allegations, Alabama Aircraft cites an Air Force briefing conducted on March 11, 2008, eight days after the contractual award to Boeing was announced, as evidence "that the Air Force's actual requirement may be as high as 36 aircraft per year due to a shortfall in the Air Force's own ability to perform PDM." Pl.'s Discovery Mot. at 9. Alabama Aircraft also cites the article in the *New York Times* discussed earlier, as evidence of an increase in requirements for KC-135 PDM. *Id.*

Alabama Aircraft's supplement to its second protest before GAO, filed on March 21, 2008, put forward the allegation that during program management review meetings held on March 11-12, 2008, the Air Force announced quantity changes to its KC-135 PDM program. *See* Pl.'s Discovery Mot. at 9-10; AR Tab 74 (Pemco's Supp. Protest (March 21, 2008)) at 4. At GAO, the government filed a request for summary dismissal of Alabama Aircraft's allegations related to the change in contract quantities and scope of work, averring that actual requirements had not changed. AR Tab 84 (Agency Request for Summary Dismissal) at 1, 3. In this request, Colonel Nally, a commander whose responsibilities include "translating operational requirements into contractual requirements to support the current and future KC-135 fleet," asserted that:

[13]The Air Force indicated in the solicitation that its best estimated quantity of KC-135 aircraft that would require PDM annually under the contract was twenty-four. However, the Air Force also disclosed that the actual number of aircraft to be so maintained might range up to forty-eight aircraft annually. AR Tab 4 (Request For Proposals/Solicitation FA 8105-05-R-0014).

> During the most recent PDM PMR [Program Management Reviews] (11-12 Mar 08), the Air Force presented a briefing on potential future maintenance concepts. PEMCO's assertion that the Air Force's PMR presentation announced a change in the number of aircraft expected to undergo contract PDM is incorrect. The number of PDM aircraft planned for both organic and contract PDM remains unchanged. . . . The Best Estimated Quantity for the contractor remains at 24 aircraft per year as stated in the solicitation.

*Id*. at 7. GAO stated its understanding that Alabama Aircraft's allegations were based on a "potential change in the PDM cycle" and subsequently dismissed the allegations, concluding that "[u]ntil the agency has made a decision regarding a potential change in contract requirements, a protest based on the protester's anticipation of the agency's subsequent course of action is speculative and premature." AR Tab 90 (*Pemco Aeroplex, Inc. - Dismissal*, No. B-310372.4, 2008 WL 1930918 (G.A.O. May 2, 2008)), slip op. at 4-5 (citing *Lockheed Martin Aeronautics Co.*, B-298626, Nov. 21, 2006, 2006 CPD ¶ 177 at 7-8).

Alabama Aircraft also alleges that the requirements have changed due to the reopening of the Air Force procurement of the KC-X contract, citing the article in the *New York Times* addressed earlier. Drawing such an inference from the newspaper article would allow the article to be used as proof of factual matters stated and thus would be inadmissible hearsay. *See* Fed. R. Evid. § 801; *United States. v. ReBrook*, 58 F.3d 961, 968 (4th Cir. 1995).

Finally, Alabama Aircraft supports this request for discovery by contending that the number of KC-135 aircraft provided with PDM at Tinker Air Base will not meet the Air Force's annual target of sixty aircraft but rather Tinker will be able to service approximately 48 aircraft per year. Pl.'s Discovery Mot. at 9-10; *see also* AR Tab 74 (Alabama Aircraft's Supplemental Protest) at 4.

Alabama Aircraft's allegations about an increase in the Air Force's requirements for contract PDM due to a shortfall in Tinker Air Force Base's maintenance capability were made on the record of the proceedings before GAO, *see* AR Tabs 74, 90, although the court has not been able to find any place in the administrative record where powerpoint slides or other documentary materials from the meeting relating to the air base's capability are located. Recognizing that this gap exists in the record, nonetheless, taking the record as a whole, the supporting evidence cited is insufficient to allow Alabama Aircraft to conduct discovery regarding the Air Force's quantity requirements, and, accordingly, this prong of plaintiff's motion is denied.

3. *Air Force's consideration of Boeing's past performance.*

Third, Alabama Aircraft seeks discovery regarding the Air Force's past performance evaluation of Boeing. Specifically, Alabama Aircraft seeks to obtain Air Force documents (the "[***] package") which appear to disclose a recommendation for [***] in connection with three

contracts, one of which appears to have been the predecessor KC-135 PDM contract. Pl.'s Discovery Mot. at 11; *see also* AR Tab 73 at 73-17 (E-mail from [***] to [***] " (May 25, 2007)). The [***] package was prepared for [***]. When GAO issued a Request for Production of Documents to the Air Force on November 13, 2007, it asked the Air Force to produce the documents comprising and related to the [***] package and a [***] by Boeing on the predecessor maintenance contracts. Pl.'s Discovery Mot. at 12; *see* AR Tab 93.1 at 668, 670, 673, 676. The Air Force responded on November 15, 2007 with a letter claiming privilege regarding the documents. *See* AR, Tab 93.1 at 673-74 (Letter from the Air Force to GAO (Nov. 15, 2007)). However, the Air Force nonetheless made disclosures of documents that relate to one area for which it claims privilege. Specifically, the Air Force provided GAO with copies of e-mails dated January 10, 2007 and February 7, 2007 between Assistant U.S. Attorney [***] and Air Force counsel [***] discussing strategy for pursuing [***] arising with the extant KC-135 contract. *See* AR Tab 93.1 at 702, 845. These e-mails disclose the gist of [***] into Boeing's past performance on KC-135 [***] contracts, and they draw a direct connection to the KC-135 PDM procurement at issue here. Assistant U.S. Attorney [***] sent Air Force counsel [***] the following message regarding [***] –

> [***]: FYI, DCMA has computed [***] . . . .

AR Tab 93.1 at 845 (E-mail from [***] to [***] (Feb. 6, 2007)). [***]'s response to [***] went into more detail:

> Thanks [***] . That's [***]. I still envision the [***] reconciliations from other than [***]. I spoke with [***] this morning. We discussed the legal analysis of Boeing's [***] memo (no harm no foul). And also *what to do about the* [***] *vis a vis the source selection upcoming. We all need to put our heads togeth[e]r and strategize how* [***] *is/could/should be and plot a course of action, particularly with the new contract competition looming.*

AR Tab 93.1 (E-mail from [***] to [***] (Feb.7, 2007)) (emphasis added). [***] then agreed:

> [***]: Agree 100%. How about Feb 21-23 at Tinker AFB? I need to be there for a Boeing/USAF meet on [***], so, it would be a good time to get together on the KC-135 [***] as well.

AR Tab 93.1 at 845 (E-mail from [***] to [***] (Feb. 7, 2007)).

The Air Force has resisted production of the [***] package or any further production of records relating to the [***] on several grounds. First, the Air Force contends it obtained pertinent information from Assistant U.S. Attorney [***] and Mr. [***], and that "past performance information was properly considered and reviewed by the Performance Confidence Assessment Group, the Source Selection Evaluation Team, the Contracting Officer, and the

GAO." Def.'s Opp'n at 28 (capitals omitted). This argument assumes that all of the pertinent information was included in the record. However, that appears not to be an accurate assumption. Before GAO, the Air Force relied on the facts that procurement officials received information from Assistant U.S. Attorney [***] and Mr. [***], but primarily that they were advised by Mr. [***] that [***]. AR Tab 75 (Hearing Transcript) at 29-31. That is not sufficient reason for failing to produce records about the [***] into Boeing's past performance of the KC-135 [***] maintenance contracts.

In short, the Air Force has withheld pertinent records on grounds of privilege. As the Air Force inconsistently puts it: "The record on this issue is complete and A[labama Aircraft] is not entitled to privileged papers." Def.'s Opp'n at 32 (capitals omitted). Among other things, the Air Force avers that "these privileged legal papers were not before the Source Selection Team when it made its decision." *Id*. This statement might be accurate as qualified, but it does not indicate what information was made available to the procurement authorities at an earlier time or in other than written form. This is particularly evident respecting [***] into Boeing's actions in the predecessor contract.

"The widely applied standard for determining the scope of a waiver of attorney-client privilege is that the waiver applies to all other communications relating to the same subject matter." *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1349 (Fed. Cir. 2005); *see also GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1275 (Fed. Cir. 2001); *Genentech Inc. v. United States Int'l Trade Comm'n*, 122 F.3d 1409, 1416 (Fed. Cir. 1997) ("When the attorney-client privilege has been waived, whatever the subject matter of the waiver, the privilege is gone."). Subject matter waiver extends beyond the document initially produced, so that a party is prevented from disclosing communications that support its position while simultaneously concealing communications that do not, as the Air Force appears to have done here. *See Fort James*, 412 F.3d at 1349 (citing *Weil v. Investment/Indicators, Research & Mgmt.*, 647 F.2d 18, 24 (9th Cir. 1981)). As the Federal Circuit recently explained,

> selective waiver of the privilege may lead to the inequitable result that the waiving party could waive its privilege for favorable advice while asserting its privilege on unfavorable advice. In such a case, the party uses the attorney-client privilege both as a sword and a shield. To prevent such abuses, we recognize that when a party defends its actions by disclosing an attorney-client communication, it waives the attorney-client privilege as to all such communications regarding the same subject matter.

*In re Echostar Commc'ns*, 448 F.3d 1294, 1301 (Fed. Cir. 2006) (citations omitted).

Because the Air Force disclosed a number of documents sent to or received by those individuals involved with [***], it appears to have waived its right to assert privilege respecting documentary records about [***] of Boeing's performance under the contracts for maintenance of KC-135 [***] aircraft. Nonetheless, on the record as it exists now, especially in light of the

government's cursory briefing of the waiver issue, the court is reluctant to make a finding of waiver without receiving further briefing. Accordingly, the Air Force is directed to respond to the claim that its disclosure of e-mails and attendant records was a waiver of the attorney-client privilege and work product protection respecting [***] that relates directly to Boeing's past performance evaluation. The government shall file its brief on this issue on or before August 1, 2008. Alabama Aircraft shall file its responsive brief on or before August 8, 2008. The parties are requested to focus on the criteria for waiver as explained in *Echostar*.

4. *Air Force's investigation of bias.*

Fourth, Alabama Aircraft seeks discovery relating to the Air Force's ongoing investigation of the second Source Selection Authority, Charles Riechers. Pl.'s Discovery Mot. at 13-15. The Air Force advised GAO that its investigation of Mr. Riechers's business dealings and his apparent suicide was still ongoing more than six months after the investigation began. *Id*. at 15. However, Alabama Aircraft asserts that the Air Force has not provided "any information resulting from the [g]overnment's investigation or any of the [g]overnment's findings." *Id.* Plaintiff seeks access to materials related to the investigation of Mr. Riechers's death and his conduct as SSA because "Mr. Riechers'[s] actions raise serious questions that potentially taint the KC-135 PDM procurement, and discovery could lead to evidence which would provide further indications of improprieties related to the procurement." Pl.'s Discovery Mot. at 37.

Although Mr. Riechers was the SSA for the first KC-135 PDM award in September 2007, the second award determination, made on February 29, 2008 by Brigadier General Wendy Masiello, is the Air Force's action now before the court. Brigadier General Masiello asserts that she conducted a full review of all source selection documentation: "On 23 January 2008, I met with the source selection evaluation team (SSET) and the [new] [Source Selection Advisory Council] to review the entire source selection recommendation, which included the additional price realism and risk assessments recommended by GAO." AR Tab 59 (Source Selection Decision Document) at 1. The new Source Selection Authority also asserted that she reached an independent determination that Boeing's proposal offered the Air Force the "best overall value." AR Tab 59 (Source Selection Decision Document) at 2.

Alabama Aircraft does not assert that Brigadier General Masiello was biased or had a conflict of interest, but an issue of bias nevertheless could arise if the record itself were biased and this bias carried over into the Air Force's re-evaluation of proposals. This latter aspect of bias essentially constitutes a question whether the findings themselves were arbitrary and capricious. The existing record should suffice for that inquiry. Accordingly, this aspect of plaintiff's motion for discovery is denied.

5. *Air Force's re-evaluation of proposals.*

Finally, Alabama Aircraft seeks discovery related to the Air Force's GAO-mandated reevaluation of the bidders' proposals. Pl.'s Discovery Mot. at 16. It alleges that the administrative record provides insufficient information regarding the procedure the Air Force followed in making its reevaluation determination and that discovery "is necessary for this [c]ourt to 'perform an informed review' of whether the evaluation of proposals was conducted appropriately." Pl.'s Discovery Mot. at 39 (citing *Pikes Peak Family Housing, LLC v. United States*, 40 Fed. Cl. 673, 677 (1998)).

When reviewing an administrative record, the court should "should focus on the 'contemporaneous' record made at the time the action was taken." *OTI America, Inc. v. United States*, 68 Fed. Cl. 108, 118 (2005) (citing *Camp v. Pitts*, 411 U.S. at 142). However, because "the Administrative Procedure Act does not itself require an agency to explain the basis for its decision, unless an adjudication required to be made on the record or a formal rulemaking is involved," it is foreseeable that there may be gaps in the administrative record. *Id*., 68 Fed. Cl. at 118 (quoting *Impresa Construzioni*, 238 F.3d at 1337).[14] Nevertheless, the mere presence of gaps in the administrative record is not sufficient to justify discovery. Rather, agency decisions, including those of contracting officers, are entitled to a presumption of regularity, "unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious." *Impresa Construzioni*, 238 F.3d at 1338. Alabama Aircraft would thus need to demonstrate the existence of such evidence in order to obtain discovery.

In this case, however, Alabama Aircraft has not indicated the existence of any such record evidence and has failed to demonstrate the existence of any undocumented decisions or undocumented bases for record decisions that might have influenced the Air Force's re-award to Boeing. *See* Pl.'s Discovery Mot. at 16, 38-40. Instead, Alabama Aircraft merely restates in various forms its contention that the record is incomplete and that discovery is the only way to guarantee "an informed review of whether the evaluation of proposals was conducted appropriately." Pl.'s Discovery Mot. at 39 (quotation omitted); *see id.* at 39-40 (seeking to justify discovery request based on alleged omission from the record of computations performed as part of a fresh [***] analysis and failure to define the precise content of the "collective experience" relied upon by the Source Solicitation Evaluation Team in its bid evaluation).

Moreover, the Air Force has, in fact, offered an explanation for its re-award to Boeing and has provided documentation to explain its re-award decision. *Pemco Aeroplex, Inc.*, No. B-310372.3, slip op. at 8, 2008 WL 2684841, at *6 (finding that the Air Force's reevaluation had included, *inter alia*, "an analysis of the [***] proposed by Boeing to perform various portions of

---

[14]The decision at issue here is neither an adjudication on the record nor a formally promulgated rule, but rather a decision by a procurement authority within the Air Force. *Impresa Construzioni*, 238 F.3d at 1337 ("Decisions by contracting officers are not adjudicatory decisions to be made on the record after a hearing. Nor are they formal rulemakings." (citations omitted)).

the required tasks with the [***] that have been most recently experienced in performing those same tasks internally at Tinker Air Force Base; an analysis of Boeing's historical experience in achieving [***] on other aircraft programs; [and] consideration of the impact the aging fleet will have on workload requirements"); *see also* AR Tab 60 (Proposal Analysis Report/Price Competition Memorandum Addendum 1) (dealing with the GAO-mandated realism assessment of Boeing's [***] calculations), Tab 70 (Contract Pricing Reference Guide, Volume 2, Chapter 7) (discussing [***] analysis). The record thus is not bereft of any explanation, and no gap appears to exist that would call for an explanation. The Air Force's reevaluation of its cost-realism analysis will stand or fall on the existing record. Discovery on this issue is denied.

## CONCLUSION

Alabama Aircraft's Motion to Supplement the Administrative Record is GRANTED IN PART and DENIED IN PART. The motion is granted insofar as it concerns materials before GAO but omitted here and information relating to Boeing's past performance. The motion is denied regarding supplementation with materials bearing on irreparable injury and information arising after the award decision. Alabama Aircraft's Form 10-K is nonetheless added to the record for consideration in conjunction with a determination respecting irreparable injury.

Alabama Aircraft's Motion for Discovery is GRANTED IN PART and DENIED IN PART. Discovery is denied except insofar as materials withheld by the government on grounds of attorney-client privilege and work product protection are concerned. As to those materials, it appears from the record as it now stands that the government has waived the privilege and protection respecting documents dealing with the [***] by Boeing with the predecessor maintenance contracts for KC-135 [***] aircraft. The government is directed to respond to the waiver issue by filing a brief on or before August 1, 2008. Alabama Aircraft shall file its responsive brief on or before August 8, 2008.

Because this decision might contain "confidential or proprietary information" within the meaning of RCFC Appendix C, ¶ 4, and the protective order issued in this case, it is being issued under seal. The parties are requested to review the decision and to file proposed redactions on or before July 30, 2008.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge